**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BETTY JO KITTS,** | : | |
| **Plaintiff,** | : | **Case No. 2:04-cv-173** |
| **v.** | : | **Judge Holschuh** |
| **GENERAL TELEPHONE NORTH, INC.,** | : | **Magistrate Judge Abel** |
| | : | |
| **Defendant.** | : | |
| | : | |

## MEMORANDUM & ORDER

Plaintiff Betty Jo Kitts ("Kitts") filed suit against her former employer, General Telephone North, Inc., now known as Verizon North, Inc. ("Verizon"), alleging violations of the Family and Medical Leave Act ("FMLA"), intentional/reckless infliction of emotional distress, disability discrimination under Ohio Revised Code § 4112.02(A), public policy violations, and invasion of privacy.

This matter is currently before the Court on three pending motions: (1) Plaintiff's motion for partial summary judgment on her FMLA claim (Record at 18); (2) Defendant's motion for summary judgment (Record at 27); and (3) Defendant's motion to strike portions of Dr. Bipin Desai's affidavit (Record at 37). For the reasons stated below, Defendant's motion to strike is granted in part and denied in part, Plaintiff's motion for partial summary judgment is denied, and Defendant's motion for summary judgment is granted with respect to Plaintiff's FMLA claim. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims; they will be dismissed without prejudice.

I.      **Factual Background and Procedural History**

The relevant facts of this case are largely undisputed.  Plaintiff Betty Jo Kitts was a customer service representative for Verizon, responsible for fielding incoming calls from Verizon customers regarding their telephone service.  (Pl. Dep. at 30, Ex. B to Def.'s Mot. Summ. J.; Kellner Aff. ¶ 9, Ex. A to Def.'s Mot. Summ. J.).  She began working at Verizon in August of 1999.  (Pl. Dep. at 32).  Early in 2002, Verizon approved Plaintiff's request for FMLA leave so that she could take care of her son, who had severe asthma, for 1-3 days at a time, up to 3 times per month for a period of six months.  (Ex. S to Pl. Dep.).  In May of 2002, Verizon approved Plaintiff's request for four days of FMLA leave so that she could care for her mother following her mother's knee surgery.  (Ex. T to Pl. Dep.).

That same summer, Plaintiff started seeing psychiatrist Dr. Bipin Desai, who diagnosed her with a panic disorder with agoraphobia.  (Ex. J to Pl. Dep.; Desai Aff. ¶¶ 3, 6, Ex. to Pl.'s Mot. Partial Summ. J.).  In October of 2002, Plaintiff sought approval from Verizon for intermittent FMLA leave due to this condition.  (Pl. Dep. at 187-90).  Dr. Desai completed the required FMLA certification form, certifying her need for intermittent leave for periods of incapacitation, which he indicated could occur up to once a week, lasting for three days at a time, for a period of one year.  Dr. Desai also certified her need for treatment twice each month, for two hours at a time.  (Desai Aff. ¶ 8; Ex. 1 to Desai Aff.). On October 29, 2002, Verizon approved Plaintiff's request for intermittent leave due to her panic disorder.  (Pl. Dep. at 197; Ex. W to Pl. Dep.).

Just one week later, on November 6, 2002, Plaintiff was scheduled to work from 11:00

2

a.m. to 8:00 p.m. (Pl. Dep. at 25-26). However, she wanted to take off early so that she could

attend her sons' parent-teacher conferences that evening. (Id. at 30). In order to leave work

early, Plaintiff was required to obtain permission from the Resource Management Group

("RMG") at Verizon. Requests for leave were granted only if there were enough customer

service representatives to cover the predicted call volume. (Stallsmith Aff. ¶ 9, Ex. C to Def.'s

Mot. Summ. J.). Plaintiff talked to Deb Ballinger in the RMG, but was informed that she would

not be permitted to leave early. (Pl. Dep. at 27-29).

A couple of weeks earlier, Dr. Desai had requested that Plaintiff have blood drawn before

her next appointment so that he could establish appropriate medication levels. (Desai Aff. ¶ 5).

During her lunch break, mid-afternoon on November 6th, Plaintiff went to the Marion

Independent Physicians Laboratory ("MIPA") to have the required blood work done. (Id. at 33-

34, 36). While she was waiting to have blood drawn, she began to feel nauseous and had an

anxiety attack. She told a MIPA employee that she could not have blood drawn that day. She

left the office, vomited in the parking lot, rested for several minutes in her truck, and then drove

home. (Id. at 38-42, 46).

Plaintiff called Verizon on her cell phone and allegedly reported to Tena Crowell that

"test meds made her ill" and that she could not return to work that day.[1] (Ex. M to Pl. Dep. at

000699). She told attendance coach Mike Cook that she was taking FMLA time off. (Ex. F to

Pl. Dep.). She took Xanax to help relieve her anxiety and laid down for a few hours. (Pl. Dep. at

42-44). By 7:15 that evening she felt a little bit better and decided to go to the parent-teacher

---

[1] Plaintiff does not recall making this statement, but does not deny that she did. (Ex. F to
Pl. Dep.).

conferences.  (Id. at 50).

When Plaintiff returned to work the following day, she was confronted by her supervisor, Kelly Stallsmith.  Stallsmith states that when Plaintiff arrived at work on November 6th, Plaintiff told her that she planned to attend parent-teacher conferences that evening.  When Plaintiff did not return after her scheduled lunch break, Stallsmith became suspicious.  (Stallsmith Aff. ¶¶ 8, 12, Ex. C to Def.'s Mot. Summ. J.).  Because Plaintiff's request for time off to attend parent-teacher conferences that evening had been denied, Stallsmith suspected that Plaintiff was not ill, but was fabricating an excuse so that she could attend the conferences as planned. When Plaintiff returned to work on November 7th, Stallsmith asked her if she had attended the conferences, but Plaintiff denied doing so.  (Id. at ¶ 11).  Based on her lingering suspicion that Plaintiff had lied about the true reason for her absence, Stallsmith spoke to her own supervisor, Jennifer Kellner, who directed her to contact Verizon Security.  (Id. at ¶¶ 13-14).

Gary Chizmar, a Verizon Security Investigator, was assigned to investigate Stallsmith's claim that Plaintiff had lied about the reason for her absence.  On November 18, 2002, Chizmar and Stallsmith met with Plaintiff to question her about the November 6th absence.  (Pl. Dep. at 54-56).  During that interview, she provided a handwritten statement of the circumstances surrounding that absence.  She said that she left work on November 6th "to have a test on liver." She claimed that she reported to the testing facility, picked up the barium she was required to drink before the liver scan, took it to her truck and drank it.  She stated that after drinking the barium, she got nauseous and left without having the liver scan done.  She admitted lying to Stallsmith about attending the parent-teacher conferences that evening because she did not want Stallsmith to think that she had taken FMLA leave for an improper purpose.  (Ex. A to Pl. Dep.;

4

Pl. Dep. at 63). According to Chizmar, Plaintiff told him that she went to Marion Regional Imaging to have the liver scan done. (Ex. 4 to Chizmar Dep., Ex. E to Def.'s Mot. Summ. J.). She also told him that when she called Verizon to report that she would be unable to return to work on November 6th, she told attendance coach Michael Cook that she was approved for FMLA leave and was taking FMLA time off. (Id.).

On November 20, 2002, Verizon management requested that Plaintiff provide documentation from Marion Regional Imaging proving that she had gone there for testing. Instead, Plaintiff provided an excuse slip from Dr. Desai, stating that she was excused from work on November 6, 2002 from 3:00 p.m. until 8:00 p.m. for "medical testing." She also provided a letter signed by Dr. Desai's office manager stating that Dr. Desai had ordered blood work and that Plaintiff had elected to have the requested blood work done at Marion Regional Imaging on November 6, 2002. (Id.; Exs. C, K to Kitts Dep.; Kitts Dep. at 67).

Management again requested that Plaintiff provide documentation from Marion Regional Imaging. (Ex. 4 to Chizmar Dep.). Instead, Plaintiff produced a note signed by Paula Price, an employee of MIPA. The note indicated that Plaintiff was at MIPA for bloodwork at 3:30 p.m. on November 6th, but that "Pt. was ill, could not take test." (Ex. B to Kitts Dep.). Because both Plaintiff and Dr. Desai had stated that she went to Marion Regional Imaging for the bloodwork, but then she produced a note from MIPA, Chizmar became suspicious. He decided to verify the validity of the excuse. (Chizmar Dep. at 97). On November 22, 2002, he went to MIPA and spoke with Linda Reynolds. Reynolds could find no record indicating that Plaintiff had blood work done at MIPA on November 6th. She told him that Paula Price would not be back in the office for several days. (Id. at 100-02).

5

Chizmar met with Plaintiff again that same day.  At this interview, Plaintiff admitted that she had made up the story about drinking barium because she did not want to go into detail about her health problems in the presence of Ms. Stallsmith and Security.  She also explained that she had been mistaken in her belief that she went to Marion Regional Imaging.  She claimed to be confused because sometimes she took her mother to Marion Regional Imaging for testing.  She claimed to have gone to MIPA instead.  (Ex. 4 to Chizmar Dep.).

A couple of days later, Chizmar returned to MIPA and interviewed Paula Price who verified that she had signed the excuse.  Price did not remember Plaintiff being at the facility on November 6, 2002, but had taken Plaintiff's word for it.  Price also told Chizmar that Plaintiff had returned later and asked her to add to the note a statement that she could not take the blood test because she had gotten sick from drinking barium.  Price refused to do so.  (Id.; Kitts Dep. at 70-71; Chizmar Dep. at 103-04).

Chizmar met with Plaintiff a third and final time on November 27th.  (Chizmar Dep. at 75).  At this interview, Plaintiff signed a statement prepared by Chizmar, which confirmed she had lied about going to Marion Regional Imaging for a liver scan and getting sick from drinking barium.  She stated that she lied because she did not want to discuss all of her medical problems in front of her supervisor and Security.  She also admitted that she had asked Paula Price at MIPA to falsify the excuse by including a statement that she had gotten sick from drinking barium at another medical testing facility.  She explained that she did this because she had already told Verizon managers that she got sick from drinking barium.  (Ex. 9 to Chizmar Dep.; Kitts Dep. Ex. F).

Chizmar reported his findings to Verizon management and gave them copies of Kitts'

6

written statements.  (Chizmar Dep. at 119).  Chizmar concluded that Plaintiff had violated three

sections of the Verizon Code of Business Conduct:  (1) failing to provide truthful information

regarding an investigation; (2) misrepresenting her health status or other reasons for absence;

and (3) knowingly preparing or providing false or misleading records or data.  (Ex. 3 to Chizmar

Dep.).  On December 2, 2002, Verizon management met to discuss the results of Chizmar's

investigation. They determined that Plaintiff should be terminated "based upon the number and

elaborate nature of the falsehoods that she provided to Verizon management and to Mr. Chizmar

prior to and during the course of Mr. Chizmar's investigation of her absence on November 6,

2002."  (Kellner Aff. ¶ 32; Stallsmith Aff. ¶ 16; Darling Dep. at 15-16; Ex. L to Kitts Dep.).

On March 3, 2004, Kitts filed a six-count Complaint against Verizon alleging: (1)

violations of the FMLA; (2) intentional/reckless infliction of emotional distress; (3) disability

discrimination under Ohio Revised Code § 4112.02(A); (4) a public policy violation for

terminating Plaintiff's employment because of her association with her sick child; (5) a public

policy violation for obtaining confidential information from Plaintiff's healthcare provider

without her permission; and (6) invasion of privacy.  On December 28, 2004, Plaintiff

voluntarily dismissed with prejudice the third and fourth counts, as well as those portions of the

first and second counts that related to the physical condition of Plaintiff's minor son.

Plaintiff has filed a motion for partial summary judgment on the issue of liability on the

FMLA claim.  Defendant has filed a motion for summary judgment on all counts.  Defendant has

also filed a motion to strike portions of Dr. Desai's affidavit, submitted by Plaintiff in support of

her motion for partial summary judgment.

## II.    Motion to Strike

7

Defendant seeks an order striking paragraphs 10 through 16 of Dr. Bipin Desai's affidavit. As noted earlier, Dr. Desai, Plaintiff's treating psychiatrist, has diagnosed Plaintiff with a panic disorder with agoraphobia. (Desai Aff. ¶ 6). The allegedly offending paragraphs of his affidavit, dated November 15, 2004, read as follows:

10.    I have been asked to assume that my patient, Betty Jo Kitts, left work around lunchtime on November 6, 2002, drove to MIPA for bloodwork, experienced a panic attack and was unable to go through testing. She sat in her truck several minutes, drove to her home, took a Xanax tablet, and laid-down. Approximately seven (7) hours later, she attended a parent-teacher conference at her child's school two minutes from her home;

11.    In my medical opinion, this is entirely consistent with patient's medical condition. She does suffer episodic, unpredictable attacks, which are relieved by Xanax and rests;

12.    In my medical opinion, patient would have been unable to engage in stressful activities at employment after the attack on November 6th, but would have been able to attend non-stressful activities;

13.    Patients who are treating for psychiatric conditions are extremely reluctant to reveal this to employers/co-workers/friends;

14.    In my experience, employers and co-workers often stigmatize patients with psychiatric conditions;

15.    I have been informed that on November 18, November 22nd, and November 27, 2002, my patient, Betty Jo Kitts was confronted by her employer about her absence of November 6th. The patient was taken on November 18th to a closed room and extensively questioned by a security officer about her absence in the presence of her Supervisor. Patient lied about what testing she had scheduled on November 6th in order to keep the real diagnosis confidential;

16.    In my opinion, the fact that the patient suffers from panic disorder and was under great stress, it was entirely predictable that she would do anything to prevent the nature of her illness from becoming known to unauthorized individuals.

Desai Aff. ¶¶ 10-16.

8

Defendant notes that Plaintiff has not identified Dr. Desai as an expert witness, and Dr. Desai has not provided a written expert witness report. Nevertheless, according to Defendant, Dr. Desai "offers an expert-like opinion regarding the general nature of 'panic disorders'" and "the behavior of an unidentified patient population." (Mot. to Strike at 3-4). Defendant further argues that because these statements are not based on Dr. Desai's personal knowledge but instead on facts that he was asked to "assume," paragraphs 10-16 of his affidavit must be stricken from the record.

Fed. R. Civ. P. 26(a)(2)(A) requires disclosure of all witnesses who will give expert testimony. Rule 26(a)(2)(B) requires an expert witness report "with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." As Plaintiff notes, treating physicians generally fall outside the scope of this rule. See Fed. R. Civ. P. 26(a)(2), Advisory Committee Notes to 1993 Amendments. ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."). As the court explained in Sullivan v. Glock, Inc., 175 F.R.D. 497, 501 (D. Md. 1997), "[t]o the extent that the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient--as opposed to being subsequently supplied by an attorney involved in litigating a case involving the condition or injury--then no Rule 26(a)(2)(B) statement should be required."

But if the treating physician plans to testify about matters learned outside the scope of care and treatment of the patient, courts have often held that an expert witness report is required.

9

See Rogers v. Detroit Edison Co., 328 F. Supp. 2d 687, 689-90 (E.D. Mich. 2004); Hawkins v.

Graceland, 210 F.R.D. 210, 211 (W.D. Tenn. 2002); Harville v. Vanderbilt Univ., Inc., No. 02-

5077, 2003 WL 22025028, at **5 (6th Cir. Aug. 27, 2003)("Rule 26 focuses on the substance of

the testimony, rather than the status of the witness"); Sowell v. Burlington Northern and Santa

Fe Railway Co., No. 03-C-3923, 2004 WL 2812090, at *1 (N.D. Ill. Dec. 7, 2004) (expert

witness report was required if the treating physician planned to "render any opinion outside of

what the medical records revealed and his treatment of [plaintiff]"); Parker v. Central Kansas

Med. Ctr., 178 F. Supp. 2d 1205, 1210 (D. Kan. 2001)(holding that because the treating

physician had not been designated as an expert witness, her testimony must be limited to

observations based on personal knowledge arising out of her treatment of the plaintiff).

  In support of its argument that portions of Dr. Desai's statements cannot be considered

because Plaintiff failed to submit an expert witness report, Defendant cites to the case of Mohney

v. USA Hockey, Inc., 300 F. Supp. 2d 556 (N.D. Ohio 2004). In Mohney, defendant sought an

order striking the affidavit testimony of plaintiff's treating physician concerning the cause of

spinal injuries sustained by the plaintiff during a hockey game. The doctor's opinion was based

on his review of a videotape of the accident. The court excluded these statements because the

testimony was consistent with the type of testimony offered by plaintiff's causation expert, and

was based on information learned outside the scope of the doctor's role as plaintiff's treating

physician. Id. at 561-62. The Sixth Circuit recently held that the district court did not abuse its

discretion in striking these portions of the affidavit. See Mohney v. USA Hockey, Inc., No. 04-

3227, 2005 WL 1655023 (6th Cir. July 14, 2005). It noted that the doctor "clearly was opining

as to the manner in which Mohney's head rotated" during the collision. The Court also noted

that there was no evidence that the doctor had formed this opinion regarding causation at the time he was treating the plaintiff.  Instead, it appeared that he had viewed the videotape of the accident several years later and rendered an opinion in anticipation of the litigation.  Id. at *6.

Applying these legal principles to Dr. Desai's testimony, the Court concludes that paragraphs 10-12 of Dr. Desai's affidavit are admissible, but paragraphs 13-16 are not.  In paragraphs 10-12, Dr. Desai states that, in his opinion, Plaintiff may have been well enough to attend her sons' parent-teacher conferences even though she had suffered a panic attack earlier that day.  He further states that, in his medical opinion, this scenario would be consistent with her condition.  These opinions are clearly based on knowledge acquired as Plaintiff's treating physician and his familiarity with the specific nature of her condition.  Therefore, no expert witness report is needed.

Paragraphs 13-16 of the affidavit, however, cross the line into expert testimony for which a written report would be required.  Dr. Desai testifies that, based on his general knowledge and experience, patients often attempt to hide their psychiatric conditions from co-workers, and it is therefore reasonable to believe that Plaintiff would have done the same.  This opinion is based not on his treatment of Plaintiff, but rather on his broader education and experience with other patients.  Because Defendant did not submit an expert report with respect to this portion of Dr. Desai's testimony, paragraphs 13-16 of Desai's affidavit will be stricken from the record.


III.	**Cross-Motions for Summary Judgment**

Plaintiff's remaining claims include: (1) an alleged violation of the FMLA; (2)

intentional or reckless infliction of serious emotional distress; (3) a public policy claim based on the fact that Defendant solicited information from Plaintiff's health care providers without her permission and then used that information to terminate her; and (4) invasion of privacy. Defendant has moved for summary judgment on all of these claims.  Plaintiff has moved for partial summary judgment on the FMLA claim only.

### A.      Standard for Granting Summary Judgment

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).  The court's duty is to determine only whether sufficient evidence has been presented to

make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

13

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

 The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  Anderson, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993).  The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. Taft Broad. Co. v.

U.S., 929 F.2d 240, 248 (6th Cir. 1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." Id. (citations omitted).

      **B.**    **FMLA Claims**

          **1.**    **Applicable Law**

The FMLA was enacted to provide job security and help employees "balance the conflicting demands of work and personal life." Price v. City of Fort Wayne, 117 F.3d 1022, 1024 (7th Cir. 1997). See also 29 U.S.C. § 2601(b). It permits eligible employees to take a total of twelve weeks of leave during any twelve-month period for one or more of the following reasons: (A) to welcome a new child into the immediate family; (B) to care for a family member with a serious health condition; or (C) because of a serious health condition that prohibits the employee from performing the functions of his or her position. See 29 U.S.C. § 2612. Time off may be taken intermittently if medically necessary. See 29 U.S.C. § 2612(b)(1).

The Sixth Circuit has recognized "two distinct theories of recovery under the FMLA." Hoge v. Honda of America Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004). "Interference" or "entitlement" claims arise under 29 U.S.C. § 2615(a)(1), which reads, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Violation of any of the implementing regulations may also constitute unlawful interference. See 29 C.F.R. § 825.220(b). "Retaliation" or "discrimination" claims arise under 29 U.S.C. § 2615(a)(2), which prohibits employers from

discharging, or discriminating against, employees who oppose unlawful FMLA practices.  See Hoge, 384 F.3d at 244.  Plaintiff in this case seeks recovery under both theories – interference and retaliation.

### a.    Interference Claim

A plaintiff asserting an FMLA "interference" claim must establish the following by a preponderance of the evidence:

(1)    she is an eligible employee, as defined in 29 U.S.C. § 2611(2);

(2)    Defendant is a covered employer, as defined in 29 U.S.C. § 2611(4);

(3)    she was entitled to take leave under the FMLA;

(4)    she gave adequate notice of her intention to take leave; and

(5)    Defendant denied her FMLA benefits to which she was entitled or otherwise interfered with her FMLA rights.

See Hoge, 384 F.3d at 244.  See also Harcourt v. Cincinnati Bell Telephone Co., – F. Supp. 2d –, 2005 WL 2000666, at *5 (S.D. Ohio Aug. 18, 2005); Sorrell v. Rinker Materials Corp., 395 F.3d 332, 335 (6th Cir. 2005); Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003). The employer's intent is irrelevant; if Plaintiff can show that she was denied FMLA benefits to which she was entitled, the employer is strictly liable.  See Hoge, 384 F.3d at 244.

In this case, the first four elements are not in dispute.  Defendant does not deny that Plaintiff was an eligible employee and Defendant was a covered employer.  Furthermore, Defendant had already determined that Plaintiff was entitled to intermittent FMLA leave because of her serious health condition for the time period from October of 2002 to October of 2003. When Plaintiff called Verizon the afternoon of November 6th, she reported that test medications had made her ill and she would be unable to return to work; she specifically invoked her right to

16

take FMLA leave.

However, based on the evidence presented, no reasonable jury could find that Defendant denied Plaintiff any FMLA benefits to which she was entitled.  Plaintiff does not allege that Defendant denied her request for intermittent FMLA leave for the afternoon of November 6th. Nor could any reasonable jury find that Defendant otherwise interfered with Plaintiff's rights under the FMLA.

Plaintiff's Complaint alleges that Defendant failed to provide her with mandatory information regarding her eligibility and the availability for leave.  (Compl. ¶ 15).  An employer's failure to provide an employee adequate notice of FMLA rights may give rise to a claim of interference, but only if such a failure causes Plaintiff to be denied benefits to which she was entitled.  See Jeremy v. Northwest Ohio Dev. Ctr., 33 F. Supp. 2d 635, 639 (N.D. Ohio 1999).  In this case, Defendant claims that Plaintiff did receive information concerning her FMLA rights when she requested leave.  But even if she did not receive adequate notice, there is absolutely no evidence that this caused Plaintiff to forfeit FMLA rights to which she was entitled.

Plaintiff also alleges that Defendant interfered with her rights under the FMLA by conducting an overreaching investigation into her November 6th absence.  Specifically, she alleges that Verizon violated the FMLA by: (1) failing to follow procedures set forth in FMLA regulations when it suspected that she was abusing her FMLA leave; (2) compelling Plaintiff to disclose to unauthorized personnel privileged medical information and then disseminating that information to others at Verizon; and (3) directly contacting MIPA, whom Verizon believed to be one of her health care providers.  The Court will briefly address these arguments.

17

Plaintiff contends that if Verizon suspected that she was lying about the reason for her November 6, 2002 absence, it should have either invoked the certification provisions set forth in 29 U.S.C. § 2613, or requested recertification as provided in 29 C.F.R. § 825.308.  Neither provision is applicable to this situation.  Section 2613 governs the process by which an employer initially certifies a request for FMLA leave.  To prevent abuse of the FMLA, the statute permits employers to require medical certification from a health care provider to substantiate the fact that the employee has a "serious health condition" and is unable to work.  See 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a).  Regulations provide that if the employer doubts the adequacy of a completed medical certification form, the employer cannot request additional information from the health care provider.  However, a health care provider representing the employer may contact the employee's health care provider, with the employee's permission, for purposes of clarification and authentication.  See 29 C.F.R. § 825.307(a).  If the employer still doubts the validity of that medical certification, the employer can require the employee to obtain a second opinion from a doctor chosen by the employer.  If the first and second opinions conflict, the employer may require a third opinion, which will be binding.  See 29 U.S.C. § 2613(c) and (d).  In this case, because Defendant had already approved Plaintiff's request for intermittent FMLA leave, these initial certification provisions are inapplicable.

The FMLA also permits an employer to request recertification of a medical condition "on a reasonable basis."  29 U.S.C. § 2613(e).  Recertification procedures are set forth in 29 C.F.R. § 825.308.  The applicable regulation states that for FMLA leave taken intermittently, the employer cannot request recertification "in less than the minimum period specified on the

18

certification as necessary for such leave" unless one of three conditions set forth in subsection (c) exists. See 29 C.F.R. § 825.308(b)(2). Therefore, because Plaintiff's need for intermittent medical leave was certified from October of 2002 until October of 2003, Verizon could not have requested recertification prior to October of 2003 unless: (1) Plaintiff requested an extension of leave; (2) circumstances described in the previous certification changed significantly; or (3) Verizon received information that cast doubt upon the continuing validity of the certification. See 29 C.F.R. § 825.308(c).

None of these situations existed. The absence at issue took place just one week after Defendant approved Plaintiff's request for intermittent FMLA leave for a period of one year. Plaintiff had not requested an extension of that leave and there is no indication that her circumstances had changed significantly during that one week. While Verizon had reason to doubt the veracity of Plaintiff's story concerning the true reason for her absence on November 6th, there is no indication that Verizon had any reason to doubt the continuing validity of Dr. Desai's broader certification of Plaintiff's need for intermittent FMLA leave. Therefore, Verizon would have been prohibited from requesting recertification. See Harcourt, – F. Supp. 2d –, 2005 WL 2000666, at *10 (holding that employer violated employee's rights by requiring recertification of FMLA-qualifying condition every 90 days despite the fact that the doctor had certified that a longer period of leave was required).

Plaintiff concedes in her reply brief that Defendant was entitled to conduct an investigation to determine whether she was abusing her FMLA leave. She argues, however, that once she submitted the excuse slip from Dr. Desai on November 18, 2002, which stated that she was required to be absent from 3:00 p.m. until 8:00 p.m. on November 6th for medical testing

19

and conclusively established that her absence was for an FMLA-qualifying reason, Defendant was foreclosed from requesting additional documentation or questioning her any further about the reason for her absence.  Under the circumstances presented here, the Court disagrees.

Because Plaintiff had requested and been denied leave to attend the parent-teacher conferences on November 6th, Defendant was understandably suspicious when she called in sick and failed to return to work after lunch.  During the November 18th interview, she told Chizmar and Stallsmith that she had reported to Marion Regional Imaging and became sick after drinking barium for a scheduled liver scan.  They reasonably requested that she provide documentation from Marion Regional Imaging to corroborate her claim.  At that point, her lies started to unravel.  Because she had not been to Marion Regional Imaging, she could not comply with Defendant's request.  She instead submitted the excuse slip from Dr. Desai.  When Defendant again pressed her for documentation from Marion Regional Imaging, Plaintiff instead produced a note from MIPA, a different testing facility.  Furthermore, the note from MIPA indicated that Plaintiff was at MIPA for a blood test, not a liver scan.  This understandably aroused further suspicion and prompted further investigation.

The FMLA prohibits employers from denying employees FMLA benefits to which they are entitled and from retaliating against employees for using FMLA leave.  But, as Defendant notes, nothing in the FMLA prohibits an employer from investigating allegations of dishonesty or from terminating an employee who violates company policies governing dishonesty.  The FMLA does not shield an employee from termination simply because the alleged misconduct concerns use of FMLA leave.  See, e.g., Hoffman v. Professional Med Team, 394 F.3d 414 (6th Cir. 2005)(no FMLA violation where employee was discharged for unprofessional conduct

consisting of hostile and profane objections to employer's denial of FMLA leave).

In fact, numerous courts have upheld the discharge of employees who lied to cover up their abuse of approved FMLA leave.  See Kaylor v. Fannin Reg'l Hosp., 946 F. Supp. 988 (N.D. Ga. 1996)(overwhelming evidence that employee was discharged for lying and misleading employer about use of FMLA leave); Agee v. Northwest Airlines, Inc., 151 F. Supp. 2d 890 (E.D. Mich. 2001)(employee terminated for falsifying sick leave, lying and failing to cooperate in employer's investigation concerning use of FMLA leave); Loomis v. Honda of America Mfg., Inc., No. C2-01-606, 2003 WL 133264 (S.D. Ohio Jan. 6, 2003)(employee terminated for misrepresenting facts, falsifying records concerning her requests for FMLA leave).  See also Peeples v. Coastal Office Products, Inc., No. 02-1848, 2003 WL 21019353 (4th Cir. May 7, 2003)(no FMLA violation when employee was terminated after attempting to conceal mental condition by providing incomplete and dishonest responses to employer's informal requests for information).

The case of Stonum v. U.S. Airways, Inc., 83 F. Supp. 2d 894 (S.D. Ohio 1999), is illustrative.  Stonum's employer had previously approved her request for intermittent FMLA leave to care for her elderly mother.  Thereafter, Stonum often left work early, claiming that her mother needed assistance, but Stonum admitted to a co-worker that she was using the time for other purposes.  The co-worker told a supervisor and the company hired a private investigator to observe Stonum's activities.  The investigator conducted surveillance on two dates in November of 1996 and noted that Stonum spent very little of her FMLA time with her mother.  Stonum took time off the last week in December and was scheduled to return on January 6th.  She called in, stating that she need to take FMLA leave on January 6th and again on January 7th.  The

21

private investigator again observed Stonum's activities on those dates.  Stonum spent only

twelve minutes with her mother on January 6th and no time with her on the 7th.  Stonum's

employer then confronted her with this evidence and gave her an opportunity to explain.  Stonum

denied that she was abusing her FMLA leave, but was discharged anyway.

       After she was terminated, she filed suit, alleging that her FMLA rights had been violated.

Stonum argued that if defendant suspected that she was abusing her FMLA leave, it should have

requested additional information from her instead of hiring a private investigator.  The court,

however, held that "[n]othing in 29 C.F.R. § 825.301 obligates an employer to 'seek

clarification' when it suspects that an employee is abusing leave granted under the FMLA, and

Sixth Circuit case law imposes no such requirement." Id. at 903.  The court found that the key

issue was whether the termination was based on the employer's reasonable, good faith belief that

she had abused her sick leave.  Id. at 903 (citing Smith v. Chrysler Corp., 155 F.3d 799, 807-08

(6th Cir. 1998)).  The court found the employer reasonably relied on several particularized facts

to support its conclusion that Stonum had abused her FMLA leave. See also LeBoeuf v. New

York Univ. Med. Ctr, No. 98CIV.0973(JSM), 2000 WL 1863762, at *3 (S.D.N.Y. Dec. 20,

2000)("Where an employee is terminated because the employer honestly believed that the

employee was not using the leave period for its intended purpose, an FMLA claim will not lie.");

Connel v. Hallmark Cards, Inc., No. 01-2060-CM, 2002 WL 1461969, at * (D. Kan. June 19,

2002)(employer who discharges employee based on reasonable and honest belief that employee

has been dishonest would not be in violation of the FMLA, even if its conclusion is mistaken).

       In the instant case, based on Plaintiff's earlier request for time off for parent-teacher

conferences, Defendant reasonably believed that Plaintiff may have lied about why she failed to

return to work after lunch on November 6th.  Plaintiff concedes that Defendant was entitled to investigate its suspicions.  Plaintiff also admits that during the course of that investigation, she told numerous lies and engaged in other acts of dishonesty.  As discussed above, she is not shielded from disciplinary action for that dishonesty simply because it concerned an FMLA-qualifying leave.

Plaintiff's other arguments relate to privacy concerns and, while the allegations may give rise to other causes of action, they do not implicate the FMLA.  She first claims that Defendant violated the FMLA by compelling her to disclose privileged medical information to unauthorized personnel.  In support, she points to Verizon's FMLA Administration Training Guide which reads as follows:

> Q.    I do not want anyone to know what my condition is.  Do I have to tell the company?
>
> A.    You can keep medical information private from your supervisor and the people you work with.  Verizon's Disability Center and the FMLA Team will need medical information to determine if your illness qualifies for FMLA leave.  Medical information that you provide to Verizon's Disability Center or to the FMLA Team is kept confidential.

(Ex. 19 to Pl.'s Mot. Partial Summ. J.).

Plaintiff contends that when she was first confronted by Gary Chizmar and Kelly Stallsmith on November 18, 2002, she lied about the nature of the test because she did not want to reveal to them the true nature of her medical condition.  (Kitts Aff. ¶ 6).  She further notes that she was never informed that she had a right to refuse to answer their questions regarding her medical history.  (Id. at ¶ 7).  Plaintiff contends that because she was not obligated to disclose confidential medical information to Chizmar and Stallsmith, her responses to their questioning

23

cannot be held against her, even if they were outright lies.  Not surprisingly, Plaintiff cites to no authority for this proposition.

Plaintiff cannot cite to any section of the FMLA or its regulations that provides employees with a right to medical privacy, or gives them the right to refuse to truthfully answer questions concerning FMLA absences.[2]  In fact, the FMLA specifically allows employers, prior to approving a request for FMLA leave, to require employees to disclose information about their health conditions.  While employers may enact policies restricting who, within the company, may have access to that information, nothing in the FMLA imposes a similar restriction. Because Plaintiff has failed to identify any authority for her claim that Defendant's questioning concerning the reasons for her November 6th absence violated her right to medical privacy under the FMLA, these allegations cannot form the basis of an interference claim.

Finally, Plaintiff argues that Gary Chizmar violated the FMLA by contacting MIPA to confirm that she had reported there for testing on November 6th.  Citing 29 C.F.R. § 825.307(a), she claims that Chizmar was required to obtain her permission prior to contacting one of her health care providers.  That regulation reads as follows:

> If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider.  However, a health care provider representing the employer may contact the employee's health care provider, with the employee's permission, for purposes of clarification and authenticity of the medical certification.

---

[2]  29 C.F.R. § 825.500(g) does require records and documents relating to medical certifications, created for purposes of FMLA, to be maintained as confidential medical records separate from the employee's personnel file.

29 C.F.R. § 825.307(a).  Paula Price's note verifying that Plaintiff reported to MIPA on November 6th for blood work falls outside the scope of this regulation.  The FMLA defines a "health care provider" as "a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices" or "any other person determined by the Secretary to be capable of providing health care services."  29 U.S.C. § 2611.  There is no evidence that Ms. Price qualifies as a "health care provider."  Furthermore, this regulation deals only with the adequacy of the initial medical certification submitted by the employee's health care provider in support of a request for leave.  Therefore, while Chizmar's questioning of Ms. Price might give rise to a different cause of action, it did not violate the FMLA.

In summary, Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact with respect to the question of whether Defendant denied FMLA benefits to which she was entitled or otherwise interfered with her rights under the FMLA.  Defendant is therefore entitled to summary judgment on Plaintiff's interference claim.

### b.      Retaliation Claim

Absent direct evidence that an employee was discharged for taking FMLA-qualified leave, FMLA "retaliation" claims are subject to the familiar burden-shifting analysis set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  See Gibson v. City of Louisville, 336 F.3d 511, 513 (6th Cir. 2003).[3]   A plaintiff can establish a prima facie case of

---

[3] The undersigned judge is aware that at least one judge in the Southern District of Ohio has adopted a single framework for analyzing all FMLA claims.  See Bradley v. Mary Rutan Hosp. Ass'n, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004).  However, because the most recent Sixth Circuit case law continues to recognize two distinct types of claims –interference claims

retaliation by showing that she exercised rights available under the FMLA, she suffered an adverse employment action, and there was a causal connection between the two. The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the employer does that, the plaintiff must prove, by a preponderance of the evidence, that the proffered reason is pretextual. Id.

The Court will assume, without deciding, that Plaintiff can establish a prima facie case. She exercised her FMLA rights by taking qualified leave the afternoon of November 6th, and she suffered an adverse employment action when she was terminated four weeks later. While Plaintiff has offered little or no evidence that she was terminated because she took FMLA leave, the Court will presume that Plaintiff might be able to establish the requisite causal connection.

The burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for terminating Plaintiff. Defendant contends that Plaintiff was discharged not for taking time off for a serious health condition, but for violating its Code of Business Conduct when she repeatedly lied before and during the Security investigation, provided false documentation regarding her FMLA leave, and misrepresented her health status.

The burden now shifts back to Plaintiff to show, by a preponderance of the evidence, that the proffered reason for her termination was pretextual. Pretext can be established by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." Manzer v.

_____

and retaliation claims – based on two different analytical frameworks, I feel constrained to follow those Sixth Circuit decisions.

Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Plaintiff cannot satisfy her burden.  She cannot show that the stated reasons for her termination were false.  Plaintiff claims she did not interfere with the investigation and submitted no false documentation in connection with her FMLA leave.  Plaintiff, however, has admitted that she lied to Ms. Stallsmith about attending the parent-teacher conferences, and lied to Gary Chizmar about getting sick from drinking barium for a scheduled liver scan.  These lies clearly interfered with the investigation.  Furthermore, Plaintiff has admitted that she included false statements concerning her November 6, 2002 absence in her handwritten statement dated November 18, 2002.  In addition, she admits that she asked Paula Price of MIPA to corroborate her lie about getting sick from drinking barium.  In light of these admissions, no reasonable jury could find that the proffered reasons for her termination have no basis in fact.

Neither can Plaintiff establish that the proffered reasons for her termination did not actually motivate her discharge.  In order to establish pretext in this manner, Plaintiff would have to show that the weight of the circumstantial evidence makes it more likely than not that her use of FMLA leave on November 6, 2002 was the true reason for her discharge.  See id.  However, there is no evidence that Plaintiff's use of FMLA leave factored into the decision to terminate her.  As Gary Chizmar explained, the focus of the investigation which led to Plaintiff's termination was on whether Plaintiff had lied about the reason for her November 6th absence.  The fact that the absence was qualified as FMLA leave was "immaterial."  (Chizmar Dep. at 63, 108).  Furthermore, it is undisputed that Plaintiff had applied for, and been granted, FMLA leave on several other occasions during her employment at Verizon and had suffered no repercussions.  (Exs. R, S, T to Pl. Dep.).  Plaintiff has presented no evidence from which a jury could find that

27

she was terminated simply because she took 5 hours of FMLA leave on November 6th.  Instead, the weight of the evidence indicates that she was terminated because she lied about the reason for her absence.  See Baugher v. Dekko Heating Techs., No. 03-2784, 2004 WL 232084 (7th Cir. Jan. 29, 2004)(holding that if employer actually believed that employee had been dishonest, "it is impossible to deem the action a pretext for discrimination or an episode of retaliation").

The third method of establishing pretext is to show that the proffered reasons were insufficient to motivate Plaintiff's discharge.  Verizon's Code of Business Conduct states that employees will "[t]ake responsibility for our personal actions, honestly accounting for and reporting our activities" and will "[f]ully cooperate with any Verizon investigation."  With respect to investigations of misconduct, it states that employees must not "[i]nterfere with an investigation, such as by providing false or incomplete information."  The Code of Business Conduct further states that employees will not misrepresent their "health status or other reasons for absence" and "will not knowingly prepare, maintain or provide false or misleading records or data."  It expressly states that "[e]mployees who violate company standards may be disciplined up to and including dismissal." (Ex. EE to Pl. Dep.).  In other words, company policy expressly provides for termination for dishonesty.  Furthermore, Plaintiff has offered no evidence of other employees who were not fired after engaging in substantially similar misconduct.  Based on the evidence presented, no reasonable jury could find that the reasons given by Defendant were insufficient to motivate Plaintiff's discharge.  Because Defendant has articulated a legitimate, non-retaliatory reason for terminating Plaintiff, and Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that the reason given was pretextual, Defendant is entitled to summary judgment on the FMLA "retaliation" claim.

### C.    Supplemental State Law Claims

Defendant has also moved for summary judgment on Plaintiff's remaining state law claims, including intentional or reckless infliction of serious emotional distress, invasion of privacy, and public policy claim.  However, since the Court will grant summary judgment on Plaintiff's FMLA claim, it declines to exercise jurisdiction over Plaintiff's supplemental state law claims.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)(holding that if the federal claims supporting supplemental jurisdiction are dismissed prior to trial, the state claims should be dismissed as well); 28 U.S.C. § 1367(c).

## IV.    Conclusion

For the reasons set forth above, Defendant's motion to strike portions of Dr. Desai's affidavit (Record at 37) is **GRANTED IN PART and DENIED IN PART**.  Plaintiff's motion for partial summary judgment (Record at 18) is **DENIED**.  The Court **GRANTS** Defendant's motion for summary judgment (Record at 27) with respect to the FMLA claim.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and, therefore, **DISMISSES** those claims **WITHOUT PREJUDICE**.

<strong>IT IS SO ORDERED.</strong>

Date: September 19, 2005                          **/s/ John D. Holschuh____**
                                                 John D. Holschuh, Judge
                                                 United States District Court